******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

Elgo, Cradle and Alexander, Js.

*Syllabus*

The plaintiffs, A Co. and E Co., sought damages from the defendants U Co.,
a utility company, U Co.'s parent company, and several individuals
for, inter alia, fraudulent nondisclosure for concealing the true cost of
environmental remediation on property the plaintiffs acquired from Q
Co. Q Co. had purchased the property from U Co., which contaminated
the site with hazardous materials. Prior to selling it to Q Co., U Co.
had a study conducted to estimate the cost of remediation and the
decommissioning of the site and designated a certain amount of money
for that purpose. It was later discovered that U Co. concealed the true
cost of remediating the site and that the cost was much higher than
was originally estimated. The trial court granted the defendants' motion
to strike several counts of the complaint, pleading fraud and unjust
enrichment against the various defendants, from which the plaintiffs
appealed to this court. *Held* that the trial court did not err in its decision
to strike portions of the complaint that pleaded fraud and unjust enrich-
ment, as that court properly concluded that the complaint contained
broad allegations that were insufficient to satisfy the pleading require-
ments for fraud and that the complaint failed to allege, with the requisite
specificity, that the defendants' alleged fraud was done to induce the
plaintiffs to act, and failed to allege that the defendants had a duty of
full and fair disclosure of known facts to the plaintiffs as it pertained
to the property: the plaintiffs' claims of fraud did not plead specific acts
and merely referenced the defendants' filings and representations as
proof of fraudulent conduct, the complaint failed to allege that the
defendants' fraudulent conduct was done with the intention or purpose
to induce the plaintiffs to act to their detriment, as the complaint did
not allege that the defendants had any knowledge that Q Co. would sell
the site to future purchasers at the time it acquired the property, the
plaintiffs were not parties to the proceedings regarding environmental
remediation that preceded the plaintiffs' entering into the leasing agree-
ment with Q Co., and, therefore, there was no special relationship that
existed between the parties; moreover, the defendants' conduct with
regulatory authorities and their filings with the Securities and Exchange
Commission did not give rise to a duty of disclosure from the defendants
to the plaintiffs; furthermore, this court declined to review the plaintiffs'
claim that the trial court improperly struck their claim of unjust enrich-
ment and that the claim should be reinstated, as that claim was inade-
quately briefed.

Argued November 16, 2020—officially released May 4, 2021

*Procedural History*

Action to recover damages for, inter alia, fraud, and
for other relief, brought to the Superior Court in the
judicial district of New Haven, where the matter was
transferred to the judicial district of Stamford-Norwalk,
Complex Litigation Docket; thereafter, the trial court,
*Lee, J.*, granted the defendants' motion to strike certain
counts of the revised complaint and rendered judgment
thereon, from which the plaintiffs appealed to this
court. *Affirmed.*

*Jules A. Epstein*, with whom were *Stephen G. Walko*,
and, on the brief, *Joshua L. Mallin* and *Andrea C. Sisca*,
for the appellants (plaintiffs).

*Elizabeth C. Barton*, with whom were *Taylor C. Amato*, and, on the brief, *Andraya Pulaski Brunau*, for the appellees (defendants).

*Opinion*

ALEXANDER, J. The plaintiffs, Asnat Realty, LLC (Asnat), and Evergreen Power, LLC (Evergreen), appeal from the judgment of the trial court, *Lee, J.*, rendered after the court granted, in part, the defendants'[1] motion to strike certain portions of their revised complaint (complaint).[2] Specifically, the trial court granted the defendants' motion to strike counts one, three, five, six, seven, eight, nine, and ten of the complaint, pleading counts of fraud as to the various defendants,[3] and count four, pleading unjust enrichment against the defendant UIL Holdings Corporation (UIL). On appeal, the plaintiffs claim that the court erred in granting the motion because (1) the complaint sufficiently pleaded claims for both fraudulent nondisclosure and fraudulent misrepresentation, (2) the defendants had a duty to the plaintiffs to disclose truthful information, (3) the complaint pleaded the fraud claims with the requisite specificity, (4) the complaint adequately alleged that the plaintiffs relied on the defendants' misrepresentations and nondisclosure to their detriment, and (5) the complaint adequately stated causes of action against the defendants. We are not persuaded and, accordingly, affirm the judgment of the trial court.

In a comprehensive and well reasoned opinion, the trial court set forth the following relevant factual history as alleged in the plaintiffs' complaint. "[The defendant United Illuminating Company (UI)] is the former owner of a parcel of land located in New Haven, Connecticut (site), where it maintained a power plant for [sixty-three] years until 1992. In doing so, UI contaminated the site with hazardous materials. Before UI sold the site, at some time around June, 1999, the Connecticut Department of Public Utility Control (DPUC)[4] ordered UI to solicit bids for remediation and decommissioning work on the site so that the DPUC could approve the sale.

"UI hired TLG Services, Inc. (TLG), to perform a study [TLG study] of the cost of remediation and decommissioning. After performing a complete study of the site, TLG concluded that remediation would cost approximately $7.6 million, and that decommissioning would cost approximately $13.2 million. On or about April 4, 2000, UI filed a motion for a protective order with the DPUC, in order to keep the TLG study confidential. The DPUC granted UI's motion for a protective order on or about May, 2000.

"On or about May 8, 2000, UI made confidential written representations to the DPUC that the TLG study revealed costs exceeding the previously estimated $8 million cost associated with decommissioning the site,[5] and through [Robert L.] Fiscus, its [chief financial officer], acknowledged to the DPUC in closed door hearings that the true cost of decommissioning was closer

to $20 million. In public hearings on that same date, UI represented that remediation costs were estimated at [$2 million] rather than the significantly higher number identified by the TLG study, and that decommissioning costs were estimated at [$6 million]. . . . The plaintiffs also allege 'UI executives falsely represented in public hearings before the DPUC that the costs associated with decommissioning the site was [$8 million]. . . .'

"On August 16, 2000, UI conveyed the site to the nonparty Quinnipiac Energy, LLC (Quinnipiac Energy), which planned to operate the plant. Under the terms of that sale, UI was to pay Quinnipiac Energy $4.25 million to take the site, and the site was to be transferred with all permits in place to generate and sell electric power. As a further part of that sale, UI paid $1.9 million to fund a Remedial Action Plan (RAP) escrow to allow Quinnipiac Energy to remediate contamination on the site. UI repeated the $2 million RAP figure in Form 10-K statements filed with the [Securities and Exchange Commission (SEC)] in 2005, 2011, and 2013, despite the $7.6 million figure indicated in the TLG study. UI failed to update the $2 million figure in its SEC statements even after it became clear that it was not enough even to pay for the environmental studies necessary to characterize the site. In all its SEC statements, UI made no mention of the TLG study, the $7.6 million estimated cost of removing hazardous material, or the $20.8 million full decommissioning estimate. . . .

"About five years after its purchase of the site, Quinnipiac Energy divided it into two parcels known as parcel A and parcel B. Around May 6, 2005, Evergreen and Quinnipiac Energy entered into an indenture of lease agreement with an option to Evergreen to buy the site (lease agreement). The lease agreement provides that Quinnipiac Energy had rights to a fund created by a 'prior owner of the site' [UI] for environmental remediation, and that such fund shall be applied toward remediation of the site without regard to whether Quinnipiac Energy or Evergreen own it at the time of remediation. In December, 2006, Quinnipiac Energy transferred parcel A to Evergreen and parcel B to Asnat. . . .

"On February 9, 2012, the Department of Energy and Environmental Protection (DEEP) issued a cease and desist order preventing anyone from entering the site due to the presence of hazardous contaminants. In 2013, DEEP issued administrative orders to the plaintiffs and UI requiring that the plaintiffs ensure that no activity of any kind took place on the site other than activities related to the disposal of contaminants, and that no person enter the buildings located on the site other than certain specified persons. On September 19, 2014, the Coast Guard issued an administrative order to the plaintiffs, and a substantively identical administrative order to UI, notifying them that contaminants at the site posed a threat to the public health, and directing

them to submit a plan to abate such threat. Thereafter, the Coast Guard conducted its own removal activities due to a lack of compliance with its administrative orders, and initiated an enforcement action against the plaintiffs seeking reimbursement for the resulting costs. In the spring of 2017, the plaintiffs paid $700,000 to be released from the claims asserted by the Coast Guard.

" 'On or about June 6, 2015, the defendants' actions in concealing the true cost of the remediation and decommissioning, and thereby deceiving the public with the false $8 million remediation cost estimate, were exposed in a front page story in the Hartford Courant.' . . . Following the release of the story, UI entered into negotiations with DEEP and the Connecticut Attorney General. On or about September 17, 2015, DEEP and UI entered into a partial consent order requiring UI to conduct environmental investigation and remediation of the site, to make available $30 million for such investigation and remediation, and to complete the remediation within three years from the date of the order. To date, UI has taken no action to remedy the site." (Footnotes added; footnote omitted.)

On August 2, 2018, the defendants filed a motion to strike the ten count complaint in its entirety. A hearing on the motion was held on October 25, 2018, and, on February 21, 2019, the court issued a memorandum of decision on the motion granting the defendants' motion to strike counts one, three, five, six, seven, eight, nine, and ten, pleading counts of fraudulent nondisclosure as to the various defendants, and count four, pleading unjust enrichment against UIL. The court denied the motion to strike as to count two, pleading unjust enrichment against UI.

We begin by discussing the basis for our jurisdiction to consider the present appeal. It is well settled that "[t]he jurisdiction of the appellate courts is restricted to appeals from judgments that are final. . . . A judgment that disposes of only a part of a complaint is not a final judgment . . . unless the partial judgment disposes of all causes of action against a particular party or parties; see Practice Book § 61-3; or if the trial court makes a written determination regarding the significance of the issues resolved by the judgment and the chief justice or chief judge of the court having appellate jurisdiction concurs. See Practice Book § 61-4 (a)." (Citation omitted; internal quotation marks omitted.) *Tyler* v. *Tyler*, 151 Conn. App. 98, 103, 93 A.3d 1179 (2014).

In the present case, the plaintiffs filed an appeal with this court on March 11, 2019. On March 12, 2019, the plaintiffs filed a motion, pursuant to Practice Book § 61-4, for leave to appeal the court's ruling striking count one against UI and to stay discovery of the remaining count two against UI pending the resolution of the appeal.[6] On April 1, 2019, the court issued a memoran-

dum of decision authorizing the interlocutory appeal of count one and denying the motion for a stay of discovery relating to count two.

On April 22, 2019, this court dismissed the appeal for a lack of final judgment because the plaintiffs had not filed a motion for judgment on the stricken counts pursuant to Practice Book § 10-44.[7] This court also denied, without prejudice, the plaintiffs' motion for leave to appeal.[8] On April 24, 2019, the plaintiffs moved for entry of judgment on counts one, three, four, five, six, seven, eight, nine and ten of the complaint, and on April 25, 2019, the court rendered judgment in favor of the defendants on these counts.

Thereafter, on May 2, 2019, the plaintiffs filed a notice to appeal and a second motion for leave for interlocutory appeal as to count one. On June 14, 2019, the court granted the motion.[9] This appeal followed.

On appeal, the plaintiffs argue that the trial court erred in its decision to strike the counts of the complaint. The plaintiffs contend that the stricken counts adequately pleaded causes of action against the defendants for fraudulent nondisclosure, fraudulent misrepresentation, and unjust enrichment. We disagree.

"We begin by setting out the well established standard of review in an appeal from the granting of a motion to strike. Because a motion to strike challenges the legal sufficiency of a pleading and, consequently, requires no factual findings by the trial court, our review of the court's ruling . . . is plenary. . . . We take the facts to be those alleged in the complaint that has been stricken and we construe the complaint in the manner most favorable to sustaining its legal sufficiency. . . . Thus, [i]f facts provable in the complaint would support a cause of action, the motion to strike must be denied. . . . Moreover, we note that [w]hat is necessarily implied [in an allegation] need not be expressly alleged. . . . It is fundamental that in determining the sufficiency of a complaint challenged by a defendant's motion to strike, all well-pleaded facts and those facts necessarily implied from the allegations are taken as admitted. . . . Indeed, pleadings must be construed broadly and realistically, rather than narrowly and technically." *Coppola Construction Co.* v. *Hoffman Enterprises Ltd. Partnership*, 309 Conn. 342, 350, 71 A.3d 480 (2013).

"Fraud involves deception practiced in order to induce another to act to her detriment, and which causes that detrimental action. . . . The four essential elements of fraud are (1) that a false representation of fact was made; (2) that the party making the representation knew it to be false; (3) that the representation was made to induce action by the other party; and (4) that the other party did so act to her detriment. . . . Because specific acts must be pleaded, the mere allega-

tion that a fraud has been perpetrated is insufficient." (Internal quotation marks omitted.) *Whitaker* v. *Taylor*, 99 Conn. App. 719, 729–30, 916 A.2d 834 (2007). "All of these ingredients must be found to exist; and the absence of any one of them is fatal to recovery." *Saggese* v. *Beazley Co. Realtors*, 155 Conn. App. 734, 752, 109 A.3d 1043 (2015).

"Fraud by nondisclosure, which expands on the first three of [the] four elements [of fraud], involves the failure to make a full and fair disclosure of known facts connected with a matter about which a party has assumed to speak, under circumstances in which there was a duty to speak. . . . A lack of full and fair disclosure of such facts must be accompanied by an intent or expectation that the other party will make or will continue in a mistake, in order to induce that other party to act to her detriment." Id., 752–53.

The plaintiffs first argue that the court erred in its determination that the complaint alleges only claims of fraudulent nondisclosure. We disagree.

"The interpretation of pleadings is always a question of law for the court  . . . . Our review of the trial court's interpretation of the pleadings therefore is plenary." *Caron* v. *Connecticut Pathology Group, P.C.*, 187 Conn. App. 555, 564, 202 A.3d 1024, cert. denied, 331 Conn. 922, 206 A.3d 187 (2019).

A review of the record shows that the plaintiffs represented to the court, and the court so determined, that they were asserting a single cause of action of fraudulent nondisclosure against each of the defendants. On August 2, 2018, the defendants moved for nonsuit or default arguing, inter alia, that the plaintiffs had failed to object or to file an amended complaint in response to a previously filed request to revise. The request to revise alleged, in part, that the plaintiffs had improperly joined two causes of action together in single counts and requested that the plaintiffs bifurcate the counts into separate claims of fraudulent misrepresentation and fraudulent nondisclosure. On that same date, the defendants filed a motion to strike and a motion to dismiss. On September 18, 2018, the plaintiffs filed their objection to the defendants' motion to strike and motion to dismiss. Contained within the plaintiffs' objection was a response to the defendants' motion for nonsuit or default, which stated that the "plaintiffs' July 3, 2018 revised complaint specifically indicates that a single cause of action for fraud, specifically fraud by nondisclosure, is being asserted against each of the defendants." On October 24, 2018, the trial court issued its order denying the defendants' motion for nonsuit and stating "the fraud counts in the revised complaint allege only fraudulent nondisclosure, as confirmed by the plaintiffs in their objection to the motion. Accordingly, the failure to split the fraud counts into two was not noncompliant with the request to revise."

Fraudulent misrepresentation and fraudulent nondisclosure are separate causes of action requiring separate elements of proof. Compare *Whitaker* v. *Taylor*, supra, 99 Conn. App. 729–30, with *Saggese* v. *Beazley Co. Realtors*, supra, 155 Conn. App. 752–53. Pleadings that broadly allege fraud, without more, are insufficient to proceed under two separate theories of that cause of action. See Practice Book § 10-26; see also *Piccolo* v. *American Auto Sales, LLC*, 195 Conn. App. 486, 500, 225 A.3d 961 (2020) ("[w]here separate and distinct causes of action (as distinguished from separate and distinct claims for relief, founded on the same cause of action or transaction), are joined, the complaint is to be divided into separate counts").

In the present case, the complaint alleges counts of "fraud" against the defendants. On the basis of the allegations contained therein, the court determined that the cause of action of fraud against the defendants sounded in fraudulent nondisclosure and that the plaintiffs *affirmatively* represented fraudulent nondisclosure as their singular cause of action in counts one, three, five, six, seven, eight, nine and ten in their filings before the court. We agree with the trial court's conclusion that the complaint asserts claims of fraudulent nondisclosure.

The determinative question in evaluating the plaintiffs' claims on appeal with respect to the counts alleging fraud, therefore, is whether the complaint sufficiently pleaded claims of fraudulent nondisclosure against the respective defendants. We agree with the trial court that it does not.

In its decision, the court concluded that the plaintiffs had not adequately pleaded counts of fraudulent nondisclosure on three separate grounds: (1) the complaint is too general to satisfy the pleading requirements for fraud; (2) the complaint does not "allege that the defendants' fraudulent conduct was intended to induce the plaintiffs to act to their detriment"; and (3) "the facts alleged show that the plaintiffs were outside the perimeter of any duty owed to them by the defendants."

First, the court concluded that the complaint contained broad allegations that were insufficient to satisfy the pleading requirements for fraud. "Where a claim for damages is based upon fraud, the mere allegation that a fraud has been perpetrated is insufficient; the specific acts relied upon must be set forth in the complaint." *Maruca* v. *Phillips*, 139 Conn. 79, 81, 90 A.2d 159 (1952); see also *Chase Manhattan Mortgage Corp.* v. *Machado*, 83 Conn. App. 183, 188, 850 A.2d 260 (2004). The plaintiffs' claims of fraud do not plead specific acts and merely reference the defendants' "filings" and "representations" as proof of fraudulent conduct. We agree with the trial court that the plaintiffs' claims "are too general to satisfy the requirements" for pleading

fraud.

Second, we agree with the trial court that the complaint failed to allege, with the requisite specificity, that the defendants' alleged fraud was done to induce the plaintiffs to act. It is an essential element of any claim of fraud that the alleged fraudulent activity was made in order "to induce action by the other party." *Whitaker* v. *Taylor*, supra, 99 Conn. App. 730. In the present case, the plaintiffs' broad claims alleging the existence of an indeterminable future market of potential purchasers of the property are insufficient to properly allege the intent "to induce action" that is necessary to plead claims of fraud. Indeed, the complaint does not allege that the defendants had any knowledge that Quinnipiac Energy would sell the site to future purchasers at the time of the initial sale. The trial court correctly found that the complaint fails to allege that the defendants' fraudulent conduct was done with the intention or purpose to induce *these* plaintiffs to act to their detriment.

Third, and central to the disposition of this appeal, the court concluded that the complaint failed to allege that the defendants had a duty of full and fair disclosure of known facts to the plaintiffs as it pertained to the property. In its decision, the court thoroughly examined the circumstances that give rise to a duty to disclose and found that neither the defendants' actions with the DPUC nor their filings with the SEC gave rise to such a duty between the defendants and the plaintiffs.

In its analysis, the court examined both our Supreme Court and Appellate Court precedent pertaining to the existence of a duty in fraudulent misrepresentation claims, as well as theories of liability for fraud committed by a third party. The court appropriately noted that "the policy considerations that support limiting the extent of a defendant's responsibility pursuant to a claim of fraudulent misrepresentation should . . . also apply to limit the extent of a defendant's duty in the context of a fraudulent nondisclosure claim."

The court found that "the complaint alleges that the DPUC ordered UI to solicit bids for the remediation and decommissioning of the site in order for the DPUC to approve UI's sale of the site to Quinnipiac Energy. . . . As such, the duty to disclose stemming from the defendants' statements to the DPUC in May, 2000, would extend to the DPUC, and likely to Quinnipiac Energy, because the defendants may be considered to have intended or reasonably expected that those statements would be communicated to them, and would influence their conduct relating to the transaction between UI and Quinnipiac Energy. . . . The same cannot be said in regard to the plaintiffs, however, *who are not alleged to have been a party to the DPUC proceedings, or to have been involved in the transaction between UI and Quinnipiac Energy.*" (Emphasis added.)

"Mere nondisclosure . . . does not ordinarily amount to fraud. . . . It will arise from such a source only under exceptional circumstances. . . . To constitute fraud on that ground, there must be a failure to disclose known facts and, in addition thereto, a request or an occasion or a circumstance which imposes a duty to speak. . . . The issue of whether a duty exists is a question of law . . . which is subject to plenary review." (Citations omitted; internal quotation marks omitted.) *DiMichele* v. *Perrella*, 158 Conn. App. 726, 731, 120 A.3d 551, cert. denied, 319 Conn. 927, 125 A.3d 203 (2015).

It is well settled that "[w]hether or not there is a duty to disclose depends on the relationship of the parties . . . or, to put it in another way, whether the occasion and circumstances are such as to impose a duty to speak . . . ." (Citations omitted.) *Roberts* v. *Paine*, 124 Conn. 170, 175, 199 A. 112 (1938). "A duty to disclose will arise if the parties share a 'special relationship.'" *DiMichele* v. *Perrella*, supra, 158 Conn. App. 732.

"In general, a special relationship that imposes a duty to disclose exists where the parties stand in some confidential or fiduciary relation to one another, such as that of principal and agent, executor and beneficiary of an estate, bank and investing depositor, majority and minority stockholders, old friends, or numerous others where special trust and confidence is reposed. In addition, certain types of contracts, such as those of suretyship or guaranty, insurance, partnership and joint adventure, are recognized as creating something in the nature of a confidential relation, and hence as requiring the utmost good faith, and full and fair disclosure of all material facts." (Internal quotation marks omitted.) Id., 732–33.

In the present case, the plaintiffs were not a party to the DPUC proceedings, and were strangers to the defendants at the time of those proceedings and at the time of the sale of the site by the defendants to Quinnipiac Energy. We conclude that no "special relationship" existed between the parties and agree with the court's analysis that the plaintiffs' claims regarding the defendants' conduct with the DPUC does not meet the duty requirement necessary for fraudulent nondisclosure.

Likewise, the court determined that the defendants' filings with the SEC did not give rise to any duty to the plaintiffs, by the defendants, necessary to satisfy the pleading requirements of fraudulent nondisclosure. The trial court analyzed and considered the purposes of the Securities Exchange Act of 1934 (act), 15 U.S.C. § 78a et seq., and concluded that "the class of persons intended to be protected by it consists of investors in the securities market. . . . Accordingly, the plaintiffs, as purchasers of the site, do not come within the class

of persons that the [act] is intended to protect. Although the statutorily required filing of a Form 10-K may give rise to a duty to speak truthfully to those that invest in, or refrain from investing in, the filer's business, the plaintiffs in the present action make no such claim. The defendants were not required to file statements with the SEC to protect real estate purchasers; they were required to file them to protect securities investors. Accordingly, although the defendants' duty to disclose truthfully likely was owed to securities investors, it was not owed to the plaintiffs here." We agree with the court's analysis of this issue and conclude that no duty of disclosure from the defendants to the plaintiffs arose from the defendants' filings with the SEC.

To support their argument that a duty does exist, the plaintiffs direct us to *Bennett Restructuring Fund, L.P.* v. *Hamburg*, Docket No. X02-CV-01-0167682-S, 2003 WL 178753 (Conn. Super. January 2, 2003) (*Bennett*). The plaintiffs assert that *Bennett* supports their argument that false statements contained in Form 10-K filings with the SEC are sufficient to allow the plaintiffs to proceed on claims of fraud against the defendants. We are unpersuaded and find *Bennett* distinguishable from the plaintiffs' claims in this appeal. In *Bennett*, the plaintiffs were purchasers of certain notes of the defendant company and alleged that the defendants had made misrepresentations and material omissions in their Form 10-K filings with the SEC, thereby wrongfully informing potential investors as to the financial health of the company. Id., *1. In denying the defendant's motion to strike the plaintiffs' count alleging negligent misrepresentation in the preparation and filing of the 10-Ks, the court found that the "facts provable under that count could establish that the plaintiffs were, as alleged, members of a *limited group of persons—potential investors in* [*the defendant company's*] *Notes—for whose benefit and guidance the defendants prepared and filed the 10-Ks in which they made their alleged misrepresentations*." (Emphasis added.) Id., *16. Thus, because the complaint alleged that the plaintiffs were within a class of potential purchasers of the notes, the court found that the plaintiffs had adequately pleaded a claim of negligent misrepresentation. Id.

The plaintiffs argue that *Bennett* supports the proposition that a noninvestor can proceed with fraud claims premised on SEC filings because the plaintiffs in that case were purchasers of the notes on the secondary market. This is, however, belied by the court's determinations that the plaintiffs were within a class of potential *investors* in the company and thus foreseeably would rely on filings with the SEC. See id. In the present case, the plaintiffs are not alleged to be potential investors in any of the defendant companies but, rather, are purchasers of real estate formerly owned by the defendant UI. We agree with the court that future purchasers of real estate are not within the duty to disclose truthful

information that comes with the filing of Form 10-Ks with the SEC.

Finally, the plaintiffs argue that the court improperly struck their claim of unjust enrichment against UIL and that the claim should be reinstated. We conclude, however, that this claim has been inadequately briefed and, thus, decline to review it.

In their initial brief before this court, the plaintiffs state that "[t]his appeal concerns only the defendants' motion to strike the fraud claims." The plaintiffs attempt, however, to resurrect their unjust enrichment claim in their reply brief by arguing that their unjust enrichment claim was sufficiently pleaded.

"It is axiomatic that a party may not raise an issue for the first time on appeal in its reply brief. . . . Our practice requires an appellant to raise claims of error in his original brief, so that the issue as framed by him can be fully responded to by the appellee in its brief, and so that we can have the full benefit of that written argument. Although the function of the appellant's reply brief is to respond to the arguments and authority presented in the appellee's brief, that function does not include raising an entirely new claim of error." (Internal quotation marks omitted.) *Crawford* v. *Commissioner of Correction*, 294 Conn. 165, 197, 982 A.2d 620 (2009). We therefore decline to review the plaintiffs' unjust enrichment claim.[10]

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendants named in the plaintiffs' complaint are: United Illuminating Company, individually and as a subsidiary of UIL Holdings Corporation; UIL Holdings Corporation, individually and as the parent company to United Illuminating Company; James P. Torgerson, individually and as the chief executive officer of United Illuminating Company; Linda L. Randell, individually and as partner of Wiggin & Dana, LLP, individually and as president and general counsel for United Illuminating Company; Bruce L. McDermott, individually and as attorney with Wiggin & Dana, LLP, individually and as general counsel for UIL Holdings Corporation; Robert L. Fiscus, individually and as chief financial officer and vice chairman of UIL Holdings Corporation; James F. Crowe, individually and as senior vice president of UIL Holding Corporation; and Dennis Hrabchack.

[2] The present case concerns the allegations as pleaded in the plaintiffs' revised complaint dated July 3, 2018. The plaintiffs commenced the present action by way of complaint on or about January 2, 2014, and filed on or about January 8, 2014, in the Superior Court, judicial district of New Haven. On March 2, 2018, the case was transferred and assigned to the Complex Litigation Docket in the judicial district of Stamford-Norwalk pursuant to General Statutes § 51-347b (a).

[3] Specifically, count one pleaded fraud as to United Illuminating Company, count three pleaded fraud as to UIL Holdings Corporation, and counts five through ten pleaded fraud as to James P. Torgerson, Linda L. Randell, Bruce L. McDermott, Robert L. Fiscus, James F. Crowe, and Dennis Hrabchack, respectively. Count two pleaded unjust enrichment as to UI and is still open pending the resolution of this appeal.

[4] DPUC was replaced by the current Public Utilities Regulatory Authority (PURA). See Department of Energy and Environmental Protection, Public Utilities Regulatory Authority, About Us, available at https://portal.ct.gov/PURA/About/About-Us (last visited April 20, 2021).

[5] It is alleged in the plaintiffs' complaint that, in 2000, "UI officials testified before the DPUC that the cost of decommissioning the site would be an estimated $8 million." .

[6] The court's decision to strike counts three through ten disposed of all causes of action against those particular defendants. The decision on those counts therefore constituted an appealable final judgment under Practice Book § 61-3.

[7] Practice Book § 10-44 provides in relevant part: "Within fifteen days after the granting of any motion to strike, the party whose pleading has been stricken may file a new pleading; provided that in those instances where an entire complaint . . . or any count in a complaint . . . has been stricken, and the party whose pleading or a count thereof has been so stricken fails to file a new pleading within that fifteen day period, the judicial authority may, upon motion, enter judgment against said party on said stricken complaint . . . or count thereof. . . ."

[8] Practice Book § 61-4 (b) provides in relevant part: "If the trial court renders a judgment described in this section without making a written determination, any party may file a motion in the trial court for such a determination within the statutory appeal period, or, if there is no applicable statutory appeal period, within twenty days after notice of the partial judgment has been sent to counsel. . . . Within twenty days after notice of such a determination in favor of appealability has been sent to counsel, any party intending to appeal shall file a motion for permission to file an appeal with the clerk of the court having appellate jurisdiction. The motion shall state the reasons why an appeal should be permitted. . . . The motion and any opposition papers shall be referred to the chief justice or chief judge to rule on the motion. . . ." In the present case, the plaintiffs had filed a motion directed to the Chief Judge of this court seeking permission to appeal the interlocutory ruling as to count one against UI on April 17, 2019.

[9] On September 27, 2019, the parties filed a joint motion to stay trial, pertaining to the still active count two, pending the disposition of this appeal, which the trial court granted on October 9, 2019.

[10] We likewise deny the plaintiffs' alternative request for leave to replead their fraudulent nondisclosure causes of action. The plaintiffs have offered only conclusory statements and limited authority to argue that the defendants would not be prejudiced if the plaintiffs were to replead.

"Whe[n] an issue is merely mentioned, but not briefed beyond a bare assertion of the claim, it is deemed to have been waived. . . . In addition, mere conclusory assertions regarding a claim, with no mention of relevant authority and minimal or no citations from the record, will not suffice. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. We do not reverse the judgment of a trial court on the basis of challenges to its rulings that have not been adequately briefed . . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited." (Citations omitted; internal quotation marks omitted.) *Manere* v. *Collins*, 200 Conn. App. 356, 358–59 n.1, 241 A.3d 133 (2020).

Furthermore, an opportunity to replead would be contrary to judicial economy in a situation, where, as here, final judgment has been rendered on the motion to strike. Although Practice Book § 10-44 provides for the opportunity to replead within fifteen days after the granting of any motion to strike, such opportunity is not applicable after final judgment has been rendered on the motion.